Craig MORRISON, Executor of the estate of Arnold John Muhl; Craig Morrison, Co–Trustee of the June Morrison Living Trust dated October 19, 1982, for June Morrison, individually; Zayda Morrison Balkus, Co–Trustee of the June Morrison Living Trust dated October 19, 1982, for June Morrison, individually; Craig Morrison, an adult individual, Custodian of Craig Morrison; Zayda Morrison Balkus, an adult individual, Custodian of Zayda Morrison, Plaintiffs–Appellants,

v.

MAHASKA BOTTLING COMPANY; John A. Muhl, Defendants–Appellees.

No. 93–3340.

United States Court of Appeals, Eighth Circuit.

Submitted April 15, 1994.

Decided Nov. 1, 1994.

Donald A. Wine, Des Moines, IA, argued (C. Carleton Frederici, on the docket), for appellants.

W. Don Brittin, Jr., Des Moines, IA, argued, for appellees.

Before BOWMAN, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and HANSEN, Circuit Judge.

PER CURIAM.

The plaintiffs appeal the district court's judgment in this diversity stockholder's suit. The dispute arises from a stock redemption agreement entered into between Arnold J. Muhl and the Mahaska Bottling Company

(Mahaska). The plaintiffs challenge the district court's determinations that Arnold Muhl's estate was not entitled to vote his stock at an annual stockholders' meeting held on April 30, 1990, that Mahaska did not breach the stock redemption agreement, and that the book value of the company at the time of redemption should not be increased by the amount of the damages awarded to Mahaska for breach of fiduciary duty committed by Mahaska's chief executive officer. We affirm in part and reverse in part.

## I.

The Mahaska Bottling Company, an Iowa corporation formed in 1947 with its principal place of business in Oskaloosa, Iowa, holds a franchise for bottling Pepsi Cola. Mahaska is a closely held corporation owned by the Arnold Muhl family. Arnold had two children, John Muhl and June Morrison. John, who is the chief executive officer of Mahaska and a defendant in this case, has four children. June has two children who are the plaintiffs in this case.

This suit boils down to a sister-brother fight for control of their deceased father's corporation. The legal dispute at issue stems from a stock redemption agreement entered into by Arnold as an estate planning tool. Arnold wanted to keep the corporation in the family, controlled by his son John. Arnold also wanted to insure that his wife (Zayda) and daughter (June) would be provided for following his death. To this end, Arnold and Zayda each entered into separate, but nearly identical, stock redemption agreements which provided that upon their deaths, Mahaska would purchase all of their shares of Mahaska stock at book value as of the year preceding their deaths. Arnold's will created a trust to hold his shares until surrendered to the company and provided that all of his assets would pass first to his wife Zayda and then to June and her children. Arnold's son John and his family would thereby retain control of Mahaska.

In 1982 when the stock redemption agreements were executed, Mahaska had 13,600 outstanding shares of stock. Arnold owned 3,217 shares and Zayda owned 3,664 shares; and together they owned slightly over fifty percent of Mahaska's outstanding shares. John and his children owned a total of 5,821 shares. June and her children owned the remaining 898 shares.

Arnold died on January 10, 1990, a resident of the state of California. Pursuant to the terms of the stock redemption agreement, Mahaska determined the book value of Arnold's shares, made the required cash deposit with the escrow agent, and delivered an executed promissory note and security agreement for the balance of the contract purchase price. Mahaska also sent a notice of redemption to June, who was then serving as the executor of Arnold's estate, in the form required by statute for corporate redemptions.

The stock redemption agreement required the estate to tender Arnold's shares to the escrow agent after Mahaska had made the downpayment and delivered the note and security agreement. Concerned that the book value had been artificially depressed by her brother John's wrongful depletion of company assets for personal use, June refused to tender the stock. Instead, June attended the annual shareholders' meeting on April 30, 1990, and attempted to vote Arnold's shares in favor of her own nominees to the board of directors. June was unsuccessful in attempting to elect her nominees because Mahaska did not allow her to vote Arnold's shares. Nevertheless, June's nominees (herself, her son (Craig Morrison), and her daughter (Zayda Balkus)) subsequently met in Newport Beach, California, on October 25, 1990, and purporting to act as Mahaska's board of directors, resolved to rescind the stock redemption agreements executed by Arnold and Zayda Muhl.

On April 27, 1990, the plaintiffs filed this action in federal court based upon diversity of citizenship. Their recast and substituted complaint alleged several claims, including a shareholders' derivative claim for breach of fiduciary duty, breach of the stock redemption agreement, fraudulent inducement, rescission, and tortious breach of an implied covenant of good faith and fair dealing. The complaint also sought an accounting to determine the extent to which company assets had

842

been wrongfully depleted and a declaratory judgment to establish that the estate was entitled to vote Arnold's shares. Mahaska asserted the statute of limitations as an affirmative defense and counterclaimed for a declaratory judgment establishing that the stock redemption agreements of Arnold and Zayda Muhl are valid and enforceable, that the estate is required to tender Arnold's shares pursuant to the agreement, and that the estate was not entitled to vote Arnold's shares.

The legal claims of breach of fiduciary duty, fraudulent inducement, and breach of the stock redemption agreement were tried to a jury in November 1992. By special verdicts, the jury found that John Muhl had breached his fiduciary duty to Mahaska, causing a loss of $578,405, of which $136,769 was barred by the statute of limitations because it was incurred before 1985 (leaving a net award of $441,636). The jury also assessed $77,958 in punitive damages against John Muhl. The jury determined the remaining claims in favor of the defendants, finding that Arnold and Zayda were not fraudulently induced into entering the stock redemption agreements and that Mahaska did not materially breach the stock redemption agreements. The district court entered judgment in accordance with the special jury verdicts, granting $441,636 in compensatory damages and $77,958 in punitive damages plus interest.

The district court then considered the equitable claims and declared that the stock redemption agreements entered into by Arnold and Zayda are valid and enforceable according to their terms, that the estate was not entitled to vote Arnold's shares at the stockholders' meeting, and that the estate is required to tender Arnold's shares to Mahaska. The district court also determined that the book value of Mahaska was $10,662,880 as of September 30, 1989, the year preceding Arnold's death.[1] The district court did not add the jury award for breach of fiduciary

duty to the September 30, 1989, book value. The plaintiffs appeal.

## II.

In a federal diversity action, state law governs the substantive issues. *See Adams v. Fuqua Indus., Inc.,* 820 F.2d 271, 273 (8th Cir.1987). We honor the agreement's choice of law provision and apply Iowa law to govern the substantive issues.

The plaintiffs raise three issues on appeal. They contend that the district court erred (1) in determining that June was not entitled to vote Arnold's shares at the April 30, 1990, shareholders' meeting, (2) in finding that Mahaska did not breach the stock redemption agreement as a matter of law or alternatively, in denying the plaintiffs' motion for a new trial, and (3) in not adjusting the book value of Mahaska on September 30, 1989, to reflect the jury award for breach of fiduciary duty. We affirm the judgment of the district court on the first two issues but reverse and remand on the third issue.

### A. *Voting Rights*

The plaintiffs contend that the district court erred in declaring that the estate was not entitled to vote Arnold's shares at the April 1990 annual shareholders' meeting. Specifically, they contend that the provision of Iowa law invoked by Mahaska to prevent the estate from voting does not govern the terms of this stock redemption agreement. We agree that the statute does not apply to this stock redemption agreement, but we conclude that the agreement itself precluded June from voting the shares for the estate.

■ Ordinarily, except under certain enumerated circumstances, Iowa law prescribes that "each outstanding share, regardless of class, is entitled to one vote on each matter voted on at a shareholder's meeting." Iowa Code Ann. § 490.721(1). Mahaska refused to allow the estate to vote Arnold's stock at the

1. The district court also determined the book value as of September 30, 1992: $11,560,583 ($14,082,840 less $2,522,257 for redemption of Arnold's shares). This valuation was potentially relevant to the valuation of Zayda Muhl's shares at the time of trial. This valuation is now moot,

however, because Zayda died more than a year later, making September 30, 1993, the relevant date for valuation of her shares. Therefore, we need not review the district court's determination of book value as of September 30, 1992.

shareholders' meeting, relying on its compliance with the statutory redemption requirements of notice of redemption and deposit of a sufficient sum. The statute on which Mahaska relied provides as follows: "Redeemable shares are not entitled to vote after notice of redemption is mailed to the holders and a sum sufficient to redeem the shares has been deposited with a bank, trust company, or other financial institution under an irrevocable obligation to pay the holders the redemption price on surrender of the shares." Iowa Code Ann. § 490.721(4) (West 1991).

Mahaska's reliance on this statute, however, was in error. The statutory reference to "redeemable" shares in § 490.721(4) addresses a class of shares which are designated as redeemable in a company's articles of incorporation and issued as such. *See* Iowa Code Ann. § 490.601(3) (the articles of incorporation may authorize a class of shares that are "redeemable" "as specified in the articles"). Arnold's shares were not designated as redeemable in Mahaska's articles of incorporation but were issued without restriction and subsequently became subject to repurchase by the company pursuant to the stock redemption agreement, which is in essence a stock repurchase agreement. Arnold's shares were therefore not "redeemable" within the meaning of the Code. The statute prohibiting the right to vote "redeemable" shares after notice of redemption simply does not directly apply to the repurchase agreement at hand.

■ The agreements that Arnold and Zayda entered into with Mahaska created a contractual right in Mahaska to repurchase the stock held by the Muhls, a right which "may only be exercised in conformity with the contractual terms." *Lange v. Lange,* 520 N.W.2d 113, 118 (Iowa 1994). The voting rights for the stock in this case must be determined by the terms of the agreements. When interpreting a contract under Iowa law, the following rules apply:

> Under the cardinal rule of contract construction, the parties' intent controls. Except where ambiguity exists, intent is determined by what the contract itself says. In interpreting a contract, we give effect to

language of the entire contract in accordance with its commonly accepted and ordinary meaning.

*Id.* at 119 (internal citations omitted).

■ The terms of Arnold's stock redemption agreement and its attached security agreement provide that upon his death and "[s]ubject to compliance by" Mahaska, the estate "shall tender for redemption" all of the deceased shareholder's stock. (Appellants' Addend. at 18–19.) The agreement preserves for Arnold, the shareholder, the right to continue to vote the shares "during his lifetime." (*Id.* at 21.) Thereafter, the company "shall have the right pending final settlement to vote the Shares ... provided, however, that [the] Estate ... shall have the right to vote the Shares upon any default by [the] Company." (Jt.App. at 297.) The parties agree that the language purporting to give the company the right to vote is not valid under Iowa law. Mahaska did not vote Arnold's shares at the April 1990 stockholders' meeting. Mahaska refused to permit June to vote Arnold's shares as executor of his estate. Nevertheless, this clear contract language demonstrates that the parties to the agreement understood that the estate would have no right to vote Arnold's shares so long as Mahaska was in compliance with the terms of the agreement, but the estate could vote the shares upon some default by Mahaska.

To comply with the agreement, Mahaska was obligated to pay 25% of the total redemption price in cash and the balance was carried on its note. The redemption price is determined either from the book value of the company as of September 30 of the year preceding the shareholder's death or from the book value as of September 30, 1981 ($665 per share), whichever is greater. (*Id.*) Mahaska's financial statement for September 30, 1989 (the relevant date for valuing Arnold's shares), showed a book value for the company of $10,662,880, resulting in a price of approximately $784 per share for Arnold's stock and a total purchase price for his shares of $2,522,256. Based upon this valuation, Mahaska irrevocably delivered $630,654 (25% of the total purchase price) to the escrow agent as a cash downpayment.

The agreement further obligated Mahaska to execute a promissory note for the remaining 75% of the purchase price payable in 28 quarterly installments beginning three months after closing and secured by a security agreement. (*Id.* at 19.) Pursuant to these requirements, Mahaska executed a promissory note in the amount of $1,891,693 (the remaining 75% of the purchase price), and a security agreement on the forms provided in the stock redemption agreement. Mahaska also delivered to the escrow agent a letter instructing it to date the note on the day the stock was tendered and that installment payments would begin in accordance with the stock redemption agreement three months after receipt of Arnold's stock certificates from the estate.

Mahaska fully and completely complied with the purchase price provisions of the stock redemption agreement. This compliance in turn obligated the estate to tender Arnold's shares pursuant to the agreement, but June refused to do so. The agreement allows the estate to retain and vote the shares only upon some failure to comply or some default on the part of Mahaska, neither of which has occurred. Therefore, we conclude that the district court correctly declared that June was not authorized to vote Arnold's shares for the estate at the April 1990 shareholders' meeting and that the board of directors she later purportedly elected at the California meeting were in fact not elected and had no authority to rescind the stock redemption agreements.

## B. *Breach of Contract*

The plaintiffs contend that the district court erred by not finding that Mahaska breached the stock redemption agreement as a matter of law or alternatively, by not granting a new trial on the basis of allegedly inconsistent verdicts on the contract claim, failure to instruct properly on the contract claim, and improper argument at trial. On the breach of contract claim, which we review de novo as a question of law, the plaintiffs argue that John's breach of his fiduciary duty to Mahaska constitutes a material breach of Mahaska's written warranty to Arnold in the stock redemption agreement to maintain the company's financial integrity. We disagree.

In the stock redemption agreement, Mahaska warrants that it will "carry on its business and the business of all of its subsidiaries in the ordinary and usual manner and maintain their business organization and financial integrity." (Appellants' Addend. at 20.) Because the agreement does not expressly define "financial integrity," the jury was permitted to determine what meaning the parties intended to give the term. The jury found that Mahaska did not breach the warranty to maintain financial integrity. Nonetheless, the jury found that John Muhl did breach his fiduciary duty to Mahaska in the following respects: (1) by depleting assets of Mahaska for his own personal use, (2) by causing Mahaska to make loans at less than market rates of interest, and (3) by overcompensating himself and his sons. The plaintiffs urged the district court to find as a matter of law that the jury's finding of a breach of fiduciary duty on John's part amounts to a breach by Mahaska of its warranty to maintain financial integrity.

The defendants argued that Mahaska's warranty to maintain financial integrity was merely intended to insure that the company would be able to make the minimum payments required by the contract, which required a minimum purchase price of $665 per share. (*Id.* at 375–76.) Mahaska's actual undertakings pursuant to the agreement, including its irrevocable deposit of $630,654 in cash, were based upon a repurchase price of $784 per share—well above the minimum price. The district court determined that John's breach of fiduciary duty did not constitute a breach by the corporation of the stock redemption agreement as a matter of law.

We conclude that John's breach of his fiduciary duty as a corporate officer would not constitute a breach of the corporation's warranty to maintain its financial integrity as a matter of law unless the wrongful acts of the fiduciary so imperiled Mahaska's potential performance that Mahaska would not be able to meet the repurchase price when that price is calculated at the highest possible value, determined by adding back into book value

all of the fiduciary's defalcations. In this case, if all of John's defalcations of $578,405 as found by the jury are added to the $10,-662,880 book value determined by the court, the net increase in book value is $42.53 per share. The total increase in the redemption purchase price for Arnold's 3,217 shares would be $136,819, of which only $34,205 would be an immediate cash requirement. There is no showing in the evidence that Mahaska would have been unable to meet such an increased obligation. The evidence showed that as of September 30, 1992, Mahaska had more than $1 million in cash assets. We therefore conclude that the district court correctly found that there was no breach of contract as a matter of law.

■ Alternatively, the plaintiffs contend that they are entitled to a new trial based upon (1) the inconsistent verdicts, (2) the court's failure to instruct on the warranty of good faith and fair dealing, and (3) the improper argument of defense counsel. In a diversity case, a district court's denial of a motion for a new trial is a question of federal procedure, which we review for an abuse of discretion. *Lockley v. Deere & Co.,* 933 F.2d 1378, 1385 (8th Cir.1991).

■ First, we have already effectively determined that the jury's verdicts finding a breach of fiduciary duty but no breach of contract are not inconsistent. The verdicts are reconcilable because the breach of fiduciary duty did not cause or amount to a breach of the stock redemption agreements. The district court did not abuse its discretion by denying a new trial on this issue.

■ Second, the district court did not submit to the jury the plaintiffs' requested instruction on the implied covenant of good faith and fair dealing.

Generally, Iowa law requires that a court give a requested instruction when it states a correct rule of law having application to the facts of the case and the concept is not otherwise embodied in the other instructions. Nonetheless, error in giving or refusing to give an instruction does not require reversal unless the error is prejudicial.

*Stover v. Lakeland Square Owners Ass'n,* 434 N.W.2d 866, 868 (Iowa 1989) (citations omitted). Under Iowa law, "[a] contract imposes upon each party a duty of good faith in its performance and enforcement." *Engstrom v. State,* 461 N.W.2d 309, 314 (Iowa 1990) (citing Restatement (Second) of Contracts § 205 (1981)). However, we conclude that even if the district court committed error by refusing to give an instruction on the implied covenant of good faith and fair dealing as a part of its instructions on the breach of contract claim against Mahaska, the error was not reversible error because it was not prejudicial in this context.

The breach of contract claim was submitted to the jury only on the claim that Mahaska breached the duty to maintain its financial integrity, a term that the jurors were free to define. During closing arguments, the plaintiffs' counsel argued without objection as follows:

Financial integrity I believe means honesty, fair dealing, uprightness, and things of that kind. Financial means with respect to money matters. So you have a promise that, in ordinary language, implies that they're going to run this company openly and honestly, implied the company was being run with financial integrity.

. . . . .

Now, if you're going to say all [financial integrity] means is "When you get there, I'll have enough money to pay you," then you leave out the honesty and fair dealing that the law requires with respect to corporate officers.

And so financial integrity has with it— *integrity is a word that has honesty, fair dealing, and those terms in it, the same as a fiduciary relationship.* And that's why we say that the record here shows a complete and a planned attack on book value, so that book value would be low at the time that these parties came to redeem their stock.

(Jt.App. at 351, 379–80 (emphasis added).)

It is evident that the plaintiffs were allowed to argue the implied duty of good faith and fair dealing as a component of "financial integrity" as part of their breach of contract

claim. The plaintiffs also equated the implied duty of good faith with the honesty and fair dealing required of a fiduciary. Because the concept of good faith was presented to the jury in closing argument both as an element of the term "financial integrity" and as the same type of duty owed in a fiduciary relationship, we conclude that the district court did not abuse its discretion in declining to grant a new trial for its refusal to instruct on the implied covenant of good faith and fair dealing.

Third, we have considered and we reject without discussion the plaintiffs' contention that they were entitled to a new trial based upon improper argument of defense counsel. We find this issue to be without merit.

### C. Book Value of Mahaska

Finally, the plaintiffs contend that the district court should have adjusted the September 30, 1989, book value to include the jury awards for breach of fiduciary duty and punitive damages. The plaintiffs contend that this adjustment is necessary to determine the correct repurchase price for Arnold's shares. We agree.

As already discussed, Arnold's stock redemption agreement required Mahaska to repurchase his shares at a price determined from the book value as of September 30, 1989. The agreement provides that book value is to be "determined in accordance with generally accepted accounting principles." (Appellants' Addend. at 18.) Mahaska's financial statements show that the book value was $10,662,880 on September 30, 1989, but the plaintiffs contend that John's wrongful acts (which caused the jury to award damages for breach of fiduciary duty) artificially lowered the book value as of that date. The plaintiffs sought a declaratory judgment and an accounting to determine the "true" book value of Mahaska.

■ Generally accepted accounting principles allow correction of errors in a previously issued financial statement when there has been a "misuse of facts that existed at the time the financial statements were prepared." (Jt.App. at 491.) At a separate hearing after trial, the plaintiffs' expert, Yale Kramer, an attorney and certified public accountant, testified that the financial statement for September 30, 1989, was calculated based upon a "misuse of facts" because at the time the statement was prepared, John Muhl knew that his wrongful acts were depleting company assets for his own personal use. Therefore, the plaintiffs argued, the financial statement should now be corrected to include the amounts wrongfully taken from the company and represented by the jury award for breach of fiduciary duty.

To the contrary, Mark Ellsworth, a certified public accountant, testified for Mahaska that according to generally accepted accounting principles, the court should consider this jury award as a "gain contingency," which is not recognized in a financial statement until the year that the gain is actually realized. (Jt.App. at 441.) A gain contingency is "an existing condition, situation, or set of circumstances involving varying degrees of uncertainty that may, through one or more related future events, result in the acquisition or loss of an asset or the incurrence or avoidance of a liability." (Jt.App. at 486; *Miller Comprehensive GAAP Guide* at 7.01 (1993).) Considering the jury award for breach of fiduciary duty as a "gain contingency," the book value of Mahaska would increase by the amount of the award only in the year that the company realizes the award. Book value as of September 30, 1989, would not change. Mahaska alternatively argued that the plaintiffs are not entitled to an increased book value because they did not prove by what amount the book value should be increased.

The district court granted a declaratory judgment in Mahaska's favor, finding the book value of Mahaska to be the same as that listed on the financial statement for September 30, 1989, giving no benefit to Arnold's estate from the jury awards for breach of fiduciary duty and punitive damages. We review a district court's grant of a declaratory judgment for an abuse of discretion. *See Century Indem. Co. v. McGillacuty's, Inc.*, 820 F.2d 269, 270 (8th Cir.1987) ("regular abuse of discretion standard applies when district court has granted declaratory relief") (citing *Interdynamics, Inc. v. Wolf*, 698 F.2d 157, 167 nn. 9 & 10 (3d Cir.1982)).

A determination of the book value of a company is a finding of fact. *See Estate of Palmer v. Commissioner of Internal Revenue*, 839 F.2d 420, 423 (8th Cir.1988) (concluding that a determination of fair market value is a finding of fact). On appellate review, "the findings of fact of a district court, 'whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous * * *.' " *Schaefer v. Arkansas Medical Soc.*, 853 F.2d 1487, 1490 (8th Cir. 1988) (quoting Fed.R.Civ.P. 52(a)). Although we accord deference to the district court's determination of book value "as a finding of fact, it does not render our review a mere rubber stamp." *Estate of Palmer*, 839 F.2d at 423 (internal quotations omitted). A finding of fact may be clearly erroneous even when there is some evidence to support it if " 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Schaefer v. Arkansas Medical Soc.*, 853 F.2d 1487, 1490 (8th Cir.1988) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)) (other quotation omitted). Despite our recognition that the district court's determination of book value is subject to clearly erroneous review, we are left with a firm conviction that the district court's valuation is clearly erroneous.

The evidence adduced at trial concerning the breach of fiduciary duty indicates that John's wrongful acts were ongoing from before 1982 through 1992. The jury was instructed to specify what portion of the verdict represented John's breach of fiduciary duty prior to 1985 for purposes of the statute of limitations, but the jury did not specify what portion of the verdict represented damages for breach of fiduciary duty prior to September 30, 1989, for purposes of determining book value as of that date. The experts who testified in the posttrial hearing as to "generally accepted accounting principles" gave differing views on which principle to apply to this type of jury award.

While the district court was free to weigh the expert testimony, the district court was not free to ignore the clear evidence that John Muhl's wrongful depletion of company assets actually lowered Mahaska's book value, to some extent, prior to September 30, 1989, and thus his wrongful acts lowered the value of Arnold's shares. Damages for John's wrongful depletion of company assets are not a "gain" but a restoration of those assets lost through the misuse and misconduct of a company officer. John knew that he was depleting company assets for personal use but ignored these facts when the September 30, 1989, financial statement was prepared. In order to determine the true book value of the company as of September 30, 1989, an adjustment must be made to include those portions of the compensatory and punitive jury awards which represent John's wrongful acts between 1982 and September 30, 1989. To hold otherwise allows John Muhl, the major stockholder and chief executive officer of Mahaska, to benefit from his own wrongdoing.[2]

### III.

We believe the district court is better suited to make the difficult, fact-bound determination of what portion of the jury verdicts represents John's wrongful depletion of company assets for the period from 1982 through September 30, 1989. Therefore, we remand to the district court for a determination of the book value of Mahaska on September 30, 1989, in light of the jury's award for breach of fiduciary duty and punitive damages. In all other respects, we affirm the judgment of the district court.

HANSEN, Circuit Judge, concurring in part and dissenting in part.

I concur in the opinion of the court with one exception. While I agree that the portion of compensatory damages which represents John Muhl's breach of fiduciary duty to Mahaska prior to September 30, 1989, should

---

2. The dissenting opinion, *post* at 18, refers to the difficulty of apportioning the punitive damage award. We believe, however, that there is an easy solution to this difficulty. The onus here is on John Muhl, whose wrongdoing has depressed the book value of Mahaska. We therefore direct the district court to include the entire punitive damage award in book value as of September 30, 1989 in the event the court is unable to find a rational basis for making an apportionment.

be added into the book value of Mahaska as of that date, I do not agree that the punitive damages should be treated in the same manner. For the reasons that follow, I dissent from the court's decision in part II C and part III to include the punitive damages award in the book value of Mahaska as of September 30, 1989.

First and foremost, the court's decision to add the punitive damage award back into book value as of September 30, 1989, is contrary to Iowa law and the terms of the stock redemption agreement. Punitive damages in Iowa "are awarded, not because a plaintiff deserves them, but as punishment, to deter the defendant and others from repeating similar outrageous conduct." *Ezzone v. Riccardi*, 1994 WL 515872, *9 (Iowa Sept. 21, 1994). The court blurs this distinction by including the punitive damages in the prior book value under the same rationale by which the court includes the compensatory damages.

An inescapable maxim of contract construction provides that the terms of the contract govern its construction, and in this case, the contract requires that book value be determined by applying generally accepted accounting principles. Because punitive damages are defined as punishment under Iowa law, the punitive damage award in this case cannot and does not represent compensation for past wrongs. Also, the amount of any potential punitive damage award arising out of John Muhl's breach of fiduciary duty was not a fact known and misused to underrepresent the value of the company on the September 30, 1989, financial statement. The punitive award is more in the nature of a gain contingency because the existence and amount of the punitive damages were uncertain until awarded by the jury. Therefore, under Iowa law and generally accepted accounting principles—both standards designated by the contract—the punitive damages should not be included in the book value of

the company until the year in which they are realized.

Second, because punitive damages were assessed by the jury, the district court will be unable to rationally apportion which part of the punitive damage award represents punishment for John Muhl's wrongful acts occurring prior to September 30, 1989. There is no evidence from which to make such an apportionment. For all we, or the district court, know, the whole of the punitive damages may have been assessed by the jury for conduct which occurred *after* 1989.[1] For the foregoing reasons, I respectfully dissent from the court's decision to include the punitive damage award in the book value of Mahaska on September 30, 1989.

---

1. The direction our court gives to the district court in footnote 2 of the majority opinion tells the district judge in effect that if you cannot apportion the punitive damage award rationally, then do the next best thing and include it all. In my view, that is a potentially unfair (albeit easy) solution to the difficult question the court creates for itself by including the punitives in the September 30, 1989, book value in the first place. It carries the very real risk of overstating book value and compelling Mahaska to pay a greater price for Arnold's shares than the contract requires.