**SOUTH SIDE REALTY CO., Inc.,**
Respondent,

v.

**Robert L. HAMBLIN, Appellant.**

No. 24116.

Kansas City Court of Appeals.

Missouri.

Dec. 7, 1964.

Motion for Rehearing or Transfer to Supreme Court Denied Feb. 1, 1965.

Rufus Burrus, Independence, for appellant.

Thomas J. Daly, Linde, Thomson, Van-Dyke, Fairchild & Langworthy, Kansas City, for respondent.

CROSS, Judge.

In this jury waived case the trial court found that plaintiff was entitled to recover of defendant the sum of $1137.00 as real estate sales commissions and entered judgment accordingly. Defendant appeals.

Plaintiff South Side Realty, Inc. prosecutes this action as the successor of Mrs. Billie E. Mills, a licensed real estate broker who formerly was engaged in business as an individual under the name "South Side Realty Company". Mrs. Mills is president, treasurer, manager and principal stockholder of plaintiff corporation. According to Mrs. Mills' testimony, when the corporation was formed in May, 1952, "We took the assets, including the office fixtures and all assets of the company, which was South Side Realty Company, and transferred them to the corporation". In particular, she assigned to the corporation all her right in a certain contract which is the subject matter of this action.

Defendant is a real estate subdivider, builder and developer. In the year 1952, while Mrs. Mills was doing business under the name "South Side Realty Company", and prior to the formation of plaintiff corporation, she owned ten large lots in Blue Ridge Ranch Estates, a subdivision in Jackson County, Missouri. On February 25, 1951, she and defendant entered into a

written undertaking entitled "Real Estate Contract" whereby she agreed to sell and convey her ten building lots to defendant for the price of $5,400.00. It was additionally provided in the written agreement as follows:

"It is agreed and understood between buyer, builder and seller that South Side Realty Company, 4060 Troost Avenue, is to have exclusive sale right until sold on each and every house built on above lots".

With reference to the foregoing quoted contract provision, plaintiff pleads in its petition that "As part of the consideration for Billie E. Mills' promise to convey the said lots, the defendant gave to Billie E. Mills the exclusive sale right, until sold, on each and every of the said lots on which the defendant should build a house. Commission due to Billie E. Mills on the sale of said lots was to be five (5) per cent".

Mrs. Mills testified that the lots were reasonably worth considerably more than the contract price, but that "the price of the lots was lowered in order to give the buyer, who was the builder, an advantage in outlay of cash. The difference was taken into consideration and was discussed at the time is why our exclusive sale right was put in there".

Pursuant to the written agreement defendant duly acquired title to the ten lots and proceeded to construct houses upon them—"two or three houses at a time". He built a total of ten houses—one on each lot.

Mrs. Mills testified that as soon as the first houses were completed she started advertising and offering them for sale, holding them open on weekends and endeavoring to sell them. She sold five houses and received full five per cent commissions on those sales except in one instance where she divided a commission with another agent.

Sometime early in 1953, defendant authorized other real estate agents to sell the remaining five houses. Mrs. Mills learned in March, 1953, that the other agents were showing the properties. She testified that upon protest to defendant "he said that we would get our commission". Mrs. Mills continued to try to sell the houses "with those other brokers on the scene". She stated, "We advertised them, we held them open, continued working on them". Under those conditions the remaining five houses were sold by persons other than Mrs. Mills. She testified, "One by one they were sold and he didn't pay us our commission and in May of '53 we protested to him regarding it. * * * He said that we would get our commissions when he got his money, when they were closed".

Over objection by defendant, Mrs. Mills testified that the term "exclusive sale right" as used in the written agreement, means, as a matter of custom, to the people engaged in the sale of real estate in the Kansas City area, that "the firm that is given exclusive sale right is to receive a full commission on each and every house sold that it covers, regardless of who sells the house. If the owner was to sell the house, they are still obligated to pay the agent a commission. They have their advertising costs and other costs involved, and that's a protection". She further testified that the customary commission being paid in February, 1952, was five per cent, that she discussed that figure with defendant, and that he knew she expected five per cent.

In his testimony defendant admits that Mrs. Mills sold "some" of the houses he had built and that she was paid commissions on the ones she sold. He does not dispute her testimony relative to the number of sales she made or that her commissions were paid at the rate of five per cent.

While still engaged in building the houses, defendant communicated to her his "dissatisfaction" with her efforts. According to defendant "the houses weren't moving". After informing her that he was going to give the houses to other realtors, he did in fact give such authority to other

real estate agents, who sold the remaining five houses.

Relative to the meaning of the contract language "exclusive right until sold", defendant admitted that it meant to him "You would have to pay the commissions to the agent to whom you granted the exclusive right". In answer to the question, "How did she get into the picture of selling the houses at all?", defendant stated, "It was some part, maybe of the transaction of the land, sir". Defendant further testified that he never revoked Mrs. Mills' contract in writing and that he never told her he was revoking her contract. Defendant was unable to state in any particular what Mrs. Mills was not doing "that was causing these houses not to be sold". Other than the fact the houses were not being sold "he knew nothing about the performance of Mrs. Mills out there".

Relying on the written agreement, plaintiff filed this action within the ten-year period of limitation provided by Section 516.110 V.A.M.S. but beyond the five-year period provided by Section 516.120 V.A.M.S. It has been defendant's position that this action is subject to the five-year limitation statute and consequently barred. The question was first raised by defendant's timely motion to dismiss and has otherwise been preserved for review.

The trial court by its finding and judgment in plaintiff's favor has effectively ruled that the ten year statute applies. In his first two points, defendant charges the court with error in so ruling. Section 516.-110 V.A.M.S. provides that certain actions shall be commenced within ten years, including "an action upon any writing, whether sealed or unsealed, for the payment of money or property". Section 516.120 V.A.M.S. prescribes the nature of actions that must be brought within five years, included among which are "All actions upon contracts, obligations or liabilities, express or implied, except those mentioned in section 516.110 * * *;".

In presenting this point, defendant quotes and relies upon the following interpretation given the ten-year statute in Lively v. Tabor, 341 Mo. 352, 107 S.W.2d 62, 111 A.L.R. 976:

"To come within the ten-year statute, 'it must appear * * * that the money sued for is promised to be paid by the language of the writing sued upon'; and 'unless the payment of the money sued for was promised by the terms of the writing, either in express language or by language which is tantamount or equivalent to such promise,' the ten-year statute does not apply. 'If a promise to pay the money sued for does not arise from the language of the writing itself, but the obligation or liability of defendant therefor is one implied by law from the transaction or one that arises only upon proof of extrinsic facts,' then the action is within the five-year statute".

Referring to the words of the writing upon which plaintiff relies, to-wit: "It is agreed and understood between buyer, builder and seller that South Side Realty Company, 4060 Troost Avenue is to have exclusive sale right until sold on each and every house built on above lots", defendant says it will be noted that no promise to pay any amount as a commission was stated. Admitting "The most that would be possible is an implied promise by the terms 'exclusive sale right'", defendant argues that there is "no formula for determining what commission rate would be paid, and on what amount it would be computed,—all of which would depend upon proof of extrinsic facts". Further arguing, defendant submits that even if the writing contained a promise to pay a commission the amount thereof is not determinable without proof of extrinsic facts as to amounts of sale price and the rate of commission.

It is not necessary, for application of the ten-year statute, that the writing sued upon contain a promise to pay money stated in express terms. It is sufficient if

the language of the writing is susceptible, by fair implication, to the construction that it amounts to such a promise. In Herweck v. Rhodes, 327 Mo. 29, 34 S.W.2d 32, the Supreme Court stated, "Our courts hold that though the language of the writing sued on does not contain a promise in express terms to pay the money sued for, yet if by fair implication such promise arises from the language of the writing itself, the ten-year statute applies". Also see Martin v. Potashnick, 358 Mo. 883, 217 S.W.2d 379.

While it is the recognized rule that the ten-year statute does not apply where the obligation or promise to pay money arises only upon proof of extrinsic facts, it is also the law that "if the language of the writing, by fair implication, is susceptible to the construction that it contains a promise to pay money there can be no objection to the fact that the precise sum to be paid is contingent or conditional and to be ascertained after the promise to pay has been made. Lorberg v. Jaynes, Mo. App., 298 S.W. 1059; annotation (Limitation of Actions—Written Promise), 111 A.L.R. 984. Once, by fair implication, the obligation is found, the exact amount to be paid or other detail of the obligation may be shown by extrinsic evidence". Martin v. Potashnick, supra. Also see Brown v. Irving, Mo.App., 269 S.W. 686; Annotation—Limitations—Evidence Dehors Writing—129 A.L.R. 603.

With reference to the question at hand, it is our opinion that the language of the contract which grants the "exclusive sale right" to South Side Realty Company (which was one and the same as Mrs. Billie E. Mills) also connotes an understanding and agreement on the part of defendant that he would compensate his authorized agent for her professional service rendered in effecting the sale of his houses by the payment of real estate commissions. Hence, it is our conclusion that, by clear implication, the contract language contains a promise on the part of defendant to pay money.

The promise to pay commissions. having been found "by fair implication",. the formula for determining the amount thereof is readily and appropriately found in the transcript of evidence. Without dispute, the aggregate of the sales prices defendant received for the five houses sold by others than Mrs. Mills amounted to $64,000.00. The applicable rate of commission is clearly shown in evidence to be five per cent. The trial court properly ruled that the action came within the ten-year statute.

Defendant further insists that plaintiff is not entitled to recover because the written agreement lacks mutuality in that the "South Side Realty Company" is not bound to perform any service. In so contending defendant relies upon the general rule that mutuality is essential to the validity of a contract for services.

The contract sued upon by plaintiff involves subject matter and considerations other than the mere rendition of service. The agreement provided that Mrs. Mills would sell ten building lots to defendant for $5,400.00. She testified that the *monetary* consideration for these lots was a substantial sum less than their fair market value. Her willingness to sell the property at the reduced price is explained by her testimony that she did so "in order to give the buyer, who was the builder, an advantage in outlay of cash. The difference was taken into consideration and was discussed at the time is why our exclusive sale right was put in there, so that we would get the balance of our money from the lots through the commission on the sales of the houses". This testimony receives a degree of corroboration from the defendant. In response to the question "How did she get into the picture of selling houses at all?", he answered, "It was some part, maybe, of the transaction of the land, sir." Thus

it appears that the *primary* obligation imposed upon Mrs. Mills by the agreement was to convey her real estate to defendant. In effect, she purchased her "exclusive sale right"—at the price of accepting a sum less than the reasonable value of her lots—and defendant obtained a "bargain" in his purchase of the lots by giving in return the exclusive sale right. Thus we find in the contract both mutual obligation and mutual benefit. The authorities cited by defendant involve the rendition of services only and are not in point.

We further believe that the agreement itself contains the implication that Mrs. Mills was obligated to exert reasonable effort, as a licensed realtor, to sell the houses under her grant of exclusive authority. Defendant's contention otherwise is inconsistent with the interpretation he himself placed on the contract long before it became the subject of this suit. He testified that after some of the houses had been built he called Mrs. Mills at her office and complained about her not "moving" the houses, and thereafter authorized other agents to sell them. These acts and statements reflect defendant's understanding of the writing to be that Mrs. Mills was bound by its terms to exert reasonable efforts toward selling the houses. It is well established that the interpretation placed on the contract by the parties prior to the time it became a matter of controversy is entitled to great, if not controlling, influence in ascertaining the intent and understanding of the parties and courts will generally follow such practical interpretation.

Defendant next complains that the writing is so vague and indefinite as to render it void and unenforceable for uncertainty. This complaint is not developed in any particular and is supported only by citation and quotation from authorities which we do not consider in point. Our discussion of the previous assignment is applicable to the instant point and effectively disposes of it.

In his final point defendant contends that South Side Realty Company was a copartnership composed of Billie E. Mills and one Bill Eugene Musgrave and that the assignment of the "exclusive sale right" by copartner Mills to plaintiff corporation did not convey the outstanding interest of copartner Musgrave therein. Therefore, says defendant, there was a failure of proof of a property interest in plaintiff corporation necessary to entitle it to maintain this action.

Defendant makes this contention on the basis of a document which does not appear in the transcript of the trial and appeared for the first time as an exhibit attached to the motion for a new trial, same being a photostatic copy of an application for a copartnership real estate broker's license, filed by Mills and Musgrave, bearing the date February 14, 1951.

The contract in suit was entered into on February 25, 1952—more than one year after the date of the document defendant exhibits. What occurred within the interim is not shown by the record—understandably, because the documentary evidence was not produced by defendant until after the trial was closed.

The testimony before us, given by Mrs. Mills, shows that when she made the contract with defendant she was an individual doing business as "South Side Realty Company". There is nothing in the transcript of evidence to show otherwise. Even if the after trial exhibit should be considered as competent evidence, we would not be constrained to find that Mrs. Mills was party to a copartnership in 1952 merely because that might have been her status in 1951. We rule the point against defendant.

The judgment is affirmed.

All concur.