**AEROTRONICS, INC., Appellee,**

v.

**PNEUMO ABEX CORPORATION, Appellant.**

No. 94–3430.

United States Court of Appeals, Eighth Circuit.

Submitted May 15, 1995.

Decided Aug. 9, 1995.

David A. Streubel, St. Louis, MO, argued (David W. Harlan, on the brief), for appellant.

Michael Anthony Fisher, St. Louis, MO, argued (Donald G. Wilkerson, on the brief), for appellee.

Before MAGILL, Circuit Judge, HENLEY, Senior Circuit Judge, and LOKEN, Circuit Judge.

MAGILL, Circuit Judge.

Pneumo Abex Corporation appeals from a final judgment entered by the district court [1] upon a jury verdict in favor of Aerotronics, Inc. For reversal, Pneumo argues that the district court: (1) violated the parol evidence rule; (2) erred in its instructions to the jury; (3) improperly applied Missouri's ten-year statute of limitations; and (4) erred in refusing to grant Pneumo's motion for judgment as a matter of law. We affirm.

## I. BACKGROUND

Pneumo Abex Corporation (Pneumo) and its subsidiaries design and manufacture components for commercial and military aircraft. As a major part of its business, Pneumo attempts to win subcontracts for major subsystems of new airplane programs (initial development contract), such as the landing gear or flight controls, from a "prime contractor." A "prime contractor" is an airplane manufacturer such as McDonnell Douglas or Boeing who is responsible for the design, development and manufacture of a complete aircraft program. Competition among subcontractors to win an initial development program is extremely fierce. There are few opportunities to win an initial development program and the process is typically very time-consuming and expensive, lasting anywhere from five to ten years from the initial conception to actual manufacture and sale of the aircraft.

If a subcontractor wins an initial development contract for a major subsystem from a prime contractor, such as the flight controls for the F–15 from McDonnell Douglas, it is virtually guaranteed to continue on the program throughout the program's life, unless the subcontractor cannot perform. The life of an airplane program is long, usually ranging from twenty to thirty years. In addition, the subcontractor also receives the secondary sales market of spares, repairs and retrofits. Spare parts include an entire landing gear or flight control or portions of either that replace parts of the subsystem that have broken, worn out, or are replaced as a part of a safety program. The repair service includes repairing damaged or worn out subsystems and providing other types of maintenance service. Retrofitting encompasses the furnishing of new parts or equipment not available at the time of manufacture. This secondary market is an important part of the subcontractor's incentive and investment to win a new aircraft program. The sales in the secondary market sometimes exceed sales of the original production unit, and spares have a greater profit margin than the original production sales.

Foreign governments almost always made their purchases in the secondary market directly from the subcontractor. Until approximately the mid–1980s, the United States Government usually made its purchases in the secondary market through the prime contractor, such as McDonnell Douglas. The prime contractor would obtain the spare from the subcontractor and pass it along to the government at an increased price. However, after a scandal arose over the inflated prices the government was being charged, the United States began purchasing its spares directly from the subcontractor.

For slightly over twenty years, Aerotronics acted as a sales representative for two divisions of Pneumo: Cleveland Pneumatic Company (CPC) and NWL Control Systems

1. The Honorable Charles A. Shaw, United States District Judge for the Eastern District of Mis-

(NWL).[2] Aerotronics had separate sales agreements with CPC and with NWL. Under both agreements, Aerotronics represented CPC and NWL in their respective attempts to obtain initial development subcontracts and subsequent sales of flight controls and landing gear for military fighter aircraft programs, and provided a range of customer services.

Aerotronics and NWL entered into a written agreement in March 1969 (NWL agreement). This agreement authorized Aerotronics to act as NWL's exclusive sales representative in a territory which included Missouri, Texas,[3] Arkansas, Kansas, Oklahoma and Southern Illinois. Major prime contractors in this territory include McDonnell Douglas Aircraft Company in St. Louis, Missouri, and Boeing Military Airplane Company in Wichita, Kansas. Under the NWL agreement, Aerotronics promoted the sale of NWL's products in its territory and kept NWL informed of major aircraft programs and activities. The NWL agreement provided that it was governed by Michigan law. NWL terminated this agreement, pursuant to its terms, on May 11, 1991.

Aerotronics and CPC entered into a written agreement in March 1970 (CPC agreement). The CPC agreement provided that it was governed by Ohio law. Except for the choice of law provision, this agreement is identical in all relevant respects to the NWL agreement. Under the CPC agreement, Aerotronics' territory included St. Louis, Missouri, and Wichita, Kansas. In 1984, Aerotronics' territory changed to McDonnell Douglas in St. Louis, Boeing in Wichita, and Tinker Air Force Base in Oklahoma City. CPC terminated its contract with Aerotronics, pursuant to its terms, on January 9, 1989.

One reason Pneumo wanted Aerotronics to represent both CPC and NWL was because Pneumo believed it was vital for both NWL and CPC to obtain a subcontract on the new F–15 military fighter program at McDonnell Douglas. As a result of Aerotronics' efforts,

NWL won the flight control business and CPC won the landing gear business on the F–15, F–18 and AV8B military fighter aircraft development programs at McDonnell Douglas; NWL retained the F–4 program at McDonnell Douglas; and CPC won the landing gear business on the KC–135R military cargo transport plane program at Boeing (collectively referred to as "Aircraft Programs").

Under both agreements, Aerotronics' compensation was solely in the form of commissions. These commissions were determined by a scheduled rate on receipts of all sales of products within Aerotronics' territory. Aerotronics also received one-half of its normal commission for any sales of products outside its territory if Aerotronics could establish to Pneumo's satisfaction that the sales were due to Aerotronics' efforts with a prime contractor within Aerotronics' territory. The parties dispute whether the agreements provided for commissions to Aerotronics on posttermination orders received relating to Aircraft Programs awarded to Pneumo prior to termination.

Pneumo failed to pay Aerotronics commissions on sales in the secondary market of spares directly to the United States government, foreign governments and firms. Past presidents of both NWL and CPC testified at trial that they intended to pay Aerotronics commissions on all extraterritorial sales of spares on the Aircraft Programs regardless of whether Aerotronics' contract was terminated. Pneumo discovered that it was not paying commissions to Aerotronics on these sales in October 1985. In early 1989, an employee of NWL informed Aerotronics that, although not certain, he did not believe that Aerotronics was being paid commissions by NWL on third-party, secondary market, sales of spares, repairs and retrofits outside of Aerotronics' territory.

Shortly thereafter, Aerotronics unsuccessfully attempted to obtain an accounting from Pneumo. Aerotronics then filed this diversi-

---

souri.

**2.** Aerotronics entered into written agreements with CPC and NWL before they became part of Pneumo. NWL is now an unincorporated divi-

sion of Pneumo. CPC was sold to BF Goodrich in 1993.

**3.** Texas was eliminated from Aerotronics' territory in 1974.

ty action in federal district court against Pneumo for failure to pay extraterritorial and posttermination commissions due under both agreements. Pneumo counterclaimed for recoupment for erroneous payment of certain commissions. The action proceeded to a jury trial. The jury returned a verdict in favor of Aerotronics on its claims under both agreements in the amount of $3,388,124. This appeal followed. Further details will be developed as we treat those specific issues.

## II. DISCUSSION

In a federal diversity action, state law governs the substantive issues. *Morrison v. Mahaska Bottling Co.,* 39 F.3d 839, 842 (8th Cir.1994). We will honor the agreements' choice of law provisions. Accordingly, Ohio law governs the substantive issues concerning the CPC agreement, and Michigan law governs the substantive issues concerning the NWL agreement.

### A. Parol Evidence

Pneumo argues that the district court erred in: (1) determining that paragraph 11 of both agreements is ambiguous and denying its motion in limine to exclude evidence that allegedly varies or contradicts the language of paragraph 11 with respect to Aerotronics' entitlement to posttermination commissions; (2) failing to remove paragraph 7B from the jury's consideration because the court had previously ruled that paragraph 7B was unambiguous; and (3) denying its motion in limine to exclude evidence that contradicts or varies the terms of paragraph 7B regarding Aerotronics' entitlement to extraterritorial commissions.

The parol evidence rule is a matter of substantive law, not the admissibility of evidence. *American Anodco, Inc. v. Reynolds Metals Co.,* 743 F.2d 417, 422 (6th Cir. 1984) (applying Michigan law); *National City Bank, Akron v. Donaldson,* 95 Ohio App.3d 241, 642 N.E.2d 58, 60 (1994). Thus, state law applies to the resolution of this issue. We review the district court's interpretation of state law de novo, giving its decision no deference. *Carvin v. Arkansas Power & Light Co.,* 14 F.3d 399, 403–04 (8th Cir.1993) (citing *Salve Regina College v.*

*Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1220–21, 113 L.Ed.2d 190 (1991)).

Under Ohio and Michigan law, the parol evidence rule prevents the admission of extrinsic evidence of prior or contemporaneous agreements that contradict or vary the terms of a written agreement. *American Anodco, Inc.,* 743 F.2d at 422 (applying Michigan law); *Potti v. Duramed Pharmaceuticals, Inc.,* 938 F.2d 641, 647 (6th Cir.1991) (applying Ohio law); *National City Bank, Akron,* 642 N.E.2d at 60. However, parol evidence is admissible to interpret a contract provision that is ambiguous. *American Anodco, Inc.,* 743 F.2d at 422; *Shifrin v. Forest City Enter., Inc.,* 64 Ohio St.3d 635, 597 N.E.2d 499, 501 (1992).

### 1. Ambiguity of Paragraph 11

Pneumo argues that the district court erred in denying its motion for summary judgment, determining that paragraph 11 of both the NWL and the CPC agreements was ambiguous. We review the district court's grant of summary judgment de novo. Our task is to determine whether the evidence, viewed in the light most favorable to the nonmoving party, establishes that there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. *Commercial Union Ins. Co. v. McKinnon,* 10 F.3d 1352, 1354 (8th Cir.1993).

Paragraph 11 in the CPC agreement is identical to paragraph 11 in the NWL agreement. Both provide:

> In the event of termination, commissions on orders accepted prior to effective date of termination notice will be earned by [Aerotronics], and upon receipt of payment from customers will be paid by [NWL or CPC].

Appellant's App. at A87; A104. Pneumo argues that the district court should have found that this language is unambiguous, and that it establishes that Aerotronics is not entitled to commission on any requests to supply goods received after it was terminated as sales representative for NWL and CPC. Aerotronics asserts that "orders accepted" means acceptance of initial development con-

tracts for aircraft programs, not acceptance of orders for individual parts made pursuant to initial development programs. The district court found that the word "order" was ambiguous. The district court noted that the agreements referred to "order," "purchase order" and "business booked," but failed to define any of these terms. The court reasoned that orders "do not necessarily continue upon acceptance of the initial aircraft program, nor do they necessarily stop upon acceptance of the initial aircraft program." We first review its finding with respect to the CPC agreement, and then address the NWL agreement.

### a. The CPC Agreement

■ Ohio law governs the construction of the CPC agreement. In Ohio, the court must determine from the four corners of the contract whether any terms in the contract are ambiguous. *Shifrin*, 597 N.E.2d at 501. Ohio has established the following test to determine whether a contract term is ambiguous: "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id.* (internal quotation and citation omitted). In other words, a contract term is ambiguous if its meaning cannot be discerned from the four corners of the contract, or the term is susceptible of two or more reasonable interpretations. *Potti*, 938 F.2d at 647. Ohio does not allow the introduction of parol evidence to prove a contract term is ambiguous if that ambiguity is not apparent on the face of the contract. *Shifrin*, 597 N.E.2d at 501.

■ We agree with the district court's conclusion that the term "orders accepted prior to [Aerotronics'] termination" in paragraph 11 is ambiguous. Although the CPC agreement defines many of the terms utilized in the agreement, it does not define "order," "purchase order" or "business booked." "Order," "purchase order" and "business booked" may be used interchangeably throughout the agreement or they may have meanings that are distinct from one another; however, the CPC agreement offers no instruction as to this point. Upon viewing the agreement as a whole, we believe that the term "order" set forth in paragraph 11 is reasonably susceptible of two differing interpretations: (1) it may refer to a request to supply goods as Pneumo argues, or (2) it may refer to the acceptance of an initial development program as Aerotronics argues. *See Yoder v. Columbus & S. Ohio Elec. Co.*, 39 Ohio App.2d 113, 316 N.E.2d 477, 480 (1974) (contract term is ambiguous if it is susceptible of two different meanings). For example, paragraph 7B provides that Aerotronics will receive 50% of its regular commission when an order originates within its territory and is subsequently transferred outside of its territory, "for so long as the product remains on a purchase order with the Company that was obtained by [Aerotronics]." In the context of paragraph 7B, it appears that "order" refers to acceptance of an initial development program, whereas "purchase order" appears to refer to a request to supply goods, the definition that Pneumo argues is the plain meaning of the term "order."

Thus, it is not plain that the term "order," as used in paragraph 11, means a request to supply goods. Accordingly, paragraph 11 is ambiguous and the district court did not err in admitting parol evidence to determine the intent of the parties.

### b. The NWL Agreement

■ Michigan law governs the construction of the NWL agreement. Michigan allows the admission of parol evidence to indicate the parties' intent when a contract is ambiguous. *American Anodco, Inc.*, 743 F.2d at 422. Furthermore, Michigan, unlike Ohio, also allows parol evidence to be used to prove that the contract is ambiguous. *Id.* In *Goodwin, Inc. v. Coe*, the Michigan Supreme Court allowed the admission of parol evidence to show that the term "property owned by Seller" was ambiguous. 392 Mich. 195, 220 N.W.2d 664, 675 (1974). The court noted that "[i]f ambiguous terms are used, the preliminary negotiations may be considered, not to vary or contradict the plain terms of the instrument, but to aid the court in determining the intent with which such words were used." *Id.* 220 N.W.2d at 671 (internal quotation and citation omitted). In

*Petovello v. Murray,* an agreement provided for the payment of commission for the original term of the lease. 139 Mich.App. 639, 362 N.W.2d 857, 858 (1984). The court admitted parol evidence, finding the term "original term of the lease" was ambiguous because there was no reference to "original term" within the lease. *Id.* 362 N.W.2d at 859.

If anything, Michigan is more likely to find a contract term ambiguous and admit parol evidence than is Ohio. Consequently, paragraph 11 of the NWL agreement is ambiguous for the same reasons that paragraph 11 of the CPC agreement is ambiguous, which we need not reiterate. We now turn to Pneumo's argument that even if paragraph 11 is ambiguous, the admission of certain testimony violated the parol evidence rule.

■■■■■■ When a contract term is ambiguous, Ohio admits parol evidence "to explain the understanding of the parties at the time of the execution of the agreement." *Yoder,* 316 N.E.2d at 480. Ohio also allows the admission of evidence to show "the sense in which the words were used by the parties to the agreement," to show the meaning ordinarily given the ambiguous term by persons in that trade or business, and of "the actions of the parties which manifest their understanding of the agreement." *Construction Advancement Program of N. Cent. & E. Cent. Ohio v. A. Bentley & Sons Co.,* 45 Ohio App.2d 13, 340 N.E.2d 849, 853 (1975). Michigan allows introduction of extrinsic evidence to "show what was in the minds of the parties at the time of making the contract or executing the instrument, and to determine the object for or on which it was designed to operate." *Glenwood Shopping Ctr. Ltd. v. K Mart Corp.,* 136 Mich.App. 90, 356 N.W.2d 281, 286 (1984). Michigan also admits subsequent acts or declarations of the parties that show the practical construction placed upon the terms in order to ascertain the parties' intentions. *Id.* Furthermore, Michigan will

hold a party to its interpretation of an ambiguous contract term. *City of Mt. Pleasant v. Michigan Consol. Gas Co.,* 325 Mich. 501, 39 N.W.2d 49, 52 (1949).

■■■■■ Pneumo objects to the testimony of Ronald Tuchschmidt,[4] Jerome Tuchschmidt,[5] Philip Greco[6] and James A. Wood, Sr.,[7] as violating the parol evidence rule. Wood, Sr., testified that he negotiated the NWL agreement with Aerotronics. Appellant's App. at A159. Accordingly, Wood, Sr.'s testimony as to his understanding of the meaning of paragraph 11 is admissible because it is probative of Pneumo's intended meaning of paragraph 11. Greco's and the Tuchschmidts' testimony concerning their understandings of paragraph 11 is also admissible because it shows the practical construction of the contract term by the parties; this testimony is also admissible to show the sense in which the words in paragraph 11 were used.

Therefore, the district court did not err in finding that paragraph 11 of the NWL and the CPC agreements was ambiguous and in admitting parol evidence to determine the intent of the parties with respect to paragraph 11.

**2. Paragraph 7B**

Pneumo argues that the district court's admission of certain portions of testimony from Ronald Tuchschmidt and Jerome Tuchschmidt regarding the payment of extraterritorial commissions pursuant to paragraph 7B of the agreements violated the parol evidence rule. Paragraph 7B of the NWL and the CPC agreements is identical, and provides in relevant part that:

If [Aerotronics] can establish to the satisfaction of [NWL or CPC] that purchase orders received by [NWL or CPC] from sources located outside of [Aerotronics] Territory were in fact due to [Aerotronics'] efforts with a prime contractor that is located within [Aerotronics'] Territory, [Aer-

---

4. Ronald Tuchschmidt is an officer and director of Aerotronics.

5. Jerome Tuchschmidt is currently president of Aerotronics.

6. Greco was employed at Pneumo from 1970 until 1984. From 1980 until 1984, Greco was president of CPC.

7. James A. Wood, Sr., is Pneumo's former president and chief operating officer.

otronics] shall be entitled to 50% of the usual fee provided herein to be paid to it for orders it obtains for [NWL or CPC] within the territory as set forth in Exhibit "B."

Consideration in this matter is due to the origination of most contracts in the prime contractor's engineering plant requiring detailed work and expense on the part of [Aerotronics] for [NWL or CPC] to have any opportunity of producing this product for the major subcontractor.

Appellant's App. at A86; A103.

■■■ The portion of Ronald Tuchschmidt's testimony to which Pneumo objects simply states that he believes that Aerotronics is entitled to be paid for extraterritorial, secondary market sales of spares to military bases around the country, based upon the language of paragraph 7B. Ronald Tuchschmidt's testimony does not contradict or vary the provisions of paragraph 7B. Accordingly, it does not violate the parol evidence rule.

■■■ The portion of Jerome Tuchschmidt's testimony that Pneumo objects to states that he believes paragraph 7B entitles Aerotronics to commission on the extraterritorial secondary sales of spares. Jerome Tuchschmidt further testifies that the secondary market of spares follows automatically from the initial "winning" of the initial development contract for an aircraft because the spares are for "very, very complex major sub-systems" of aircraft. III Trial Tr. at 82. Contrary to Pneumo's assertions, this testimony does not vary or contradict the terms of paragraph 7B and in fact is probative of whether the extraterritorial sales resulted from Aerotronics' efforts with a prime contractor within Aerotronics' territory.

Therefore, we believe the district court did not violate the parol evidence rule in admitting the testimony of Ronald and Jerome Tuchschmidt with respect to paragraph 7B.

### B. Jury Instructions

Pneumo argues that the district court erred in refusing to give three of its requested jury instructions. The first and second instructions concern Aerotronics' entitlement to commissions on extraterritorial sales under paragraph 7B of the NWL and the CPC agreements. The third instruction concerns Pneumo's affirmative defense of equitable estoppel.

■■■ We review a district court's jury instructions for abuse of discretion. *Hoselton v. Metz Baking Co.*, 48 F.3d 1056, 1062 (8th Cir.1995). A federal district court has broad discretion in formulating jury instructions in diversity cases. *Manning v. Lunda Constr. Co.*, 953 F.2d 1090, 1092 (8th Cir. 1992) (per curiam). We will reverse a judgment "only if we find that, when viewed in their entirety, the jury instructions contained an error or errors that affected the substantial rights of the parties." *Hastings v. Boston Mut. Life Ins. Co.*, 975 F.2d 506, 510 (8th Cir.1992). Pneumo is entitled to an instruction on a theory of defense if it is legally correct, supported by the evidence, and Pneumo makes a timely request for the instruction. *Board of Water Works Trustees of Des Moines, Iowa v. Alvord, Burdick & Howson*, 706 F.2d 820, 823 (8th Cir.1983). The district court is not bound to give the instructions requested by Pneumo; rather, its instructions, when read as a whole, must fairly inform the jury of the governing law. *Manning*, 953 F.2d at 1092. Furthermore, we will sustain the district court's refusal to give an instruction that is unsupported by the evidence; "such instructions should be avoided because they are irrelevant to any finding the jury properly could make and they are thus a potential source of needless confusion." *Hoselton*, 48 F.3d at 1063.

### 1. Satisfaction

■■■ In response to Pneumo's pretrial motion for summary judgment, the district court ruled that the portion of paragraph 7B regarding extraterritorial commissions was unambiguous. The district court found that the contract provision "unambiguously entitles [Aerotronics] to fifty percent of the usual fee for a purchase order from a source located outside of [Aerotronics'] territory only after [Aerotronics] establishes, to [Pneumo's] satisfaction, that [Aerotronics'] efforts with a prime contractor in [Aerotronics'] territory in fact resulted in the purchase order." Adden-

dum at Ad–7. The court also found that Pneumo's " 'satisfaction' completely controls whether [Aerotronics] is to receive commissions for orders received from sources outside [Aerotronics'] territory." *Id.* The district court denied summary judgment, however, because it found there were genuine issues of fact concerning whether (1) Pneumo exercised its judgment that it was not satisfied reasonably and in good faith, and (2) Aerotronics' "efforts" required under paragraph 7B must be new efforts before it is entitled to extraterritorial commissions. After the close of the evidence presented at trial, Pneumo tendered Defendant's Proposed Instruction A, which provides:

> Under its contracts, Plaintiff Aerotronics had to satisfy NWL and CPC that orders received from sources outside Plaintiff's territory were in fact due to Aerotronics' efforts with a prime contractor in the territory. You are instructed that NWL and CPC's satisfaction completely controls whether plaintiff is to receive commissions for orders received from sources outside plaintiff's territory.

> You must find for the defendant, Pneumo Abex Corporation, if you find that NWL or CPC was dissatisfied and had bona fide reason for that dissatisfaction.

Appellant's App. at A68. The district court refused to give this instruction. The court found that the evidence presented at trial did not raise a factual issue concerning Pneumo's satisfaction because the secondary market for sales of spares, repairs and retrofits on an aircraft program automatically went to the subcontractor who was awarded the initial development program. Accordingly, if Aerotronics "won" an initial development contract for Pneumo, the secondary market automatically followed. It was therefore un-reasonable for Pneumo to assert that it was not satisfied that Aerotronics was entitled to commissions on any extraterritorial secondary sales. The court also refused Pneumo's proposed instruction A because it found that the instruction did not correctly state the law with respect to satisfaction in that the proposed instruction did not require Pneumo to act reasonably and in good faith to determine whether it was satisfied.

Pneumo argues that it presented evidence creating a material issue of fact regarding its satisfaction sufficient to require the court to give its proposed instruction A to the jury. It refers us to testimony from John R. Schrecongost,[8] Arnold Toivonen[9] and David Bresan.[10] They testified that they did not believe Aerotronics was entitled to commission on the extraterritorial sales of spares, repairs or retrofits because Aerotronics was not involved in obtaining the particular extraterritorial order.

However, this testimony does not contradict the district court's finding that the evidence produced at trial established that sales in the secondary market followed automatically from the award of an initial development program. As the district court noted in its summary judgment ruling, neither the CPC nor the NWL agreement required Aerotronics' efforts with respect to extraterritorial sales to be new efforts. At trial, Ronald and Jerome Tuchschmidt, Philip Greco, John Jarboe,[11] James Wood, Jr. (by deposition),[12] James Wood, Sr. (by deposition), Dennis Biety (by deposition)[13] and David J. Thompson, former Director of Engineering at McDonnell Douglas on the F–15, testified there is virtually no competition in the secondary sales market. With respect to the secondary sales market at NWL, there was no competition because the flight controls that it pro-

---

**8.** Schrecongost was employed at CPC from 1978 until 1988. From 1984 until 1988, Schrecongost was president of CPC.

**9.** Toivonen was president of NWL from March 1985 through January 1986.

**10.** Bresan is CPC's current director of marketing. He has worked at CPC since June 1956.

**11.** Jarboe was employed by Pneumo from 1954 until 1985. From 1982 until the beginning of 1985, Jarboe was NWL's president. Jarboe was involved in the original negotiations of the NWL agreement.

**12.** James Wood, Jr., was NWL's vice president of marketing until December 1990.

**13.** Biety was employed by Pneumo until March 1992. From January 1991 until March 1992, Biety was NWL's vice president of marketing and business management. Prior to that he acted as an attorney for Pneumo.

duced were proprietary: NWL owned the design for the controls. Because NWL owned the design, no other company could produce that control. Needless to say, flight controls are a very complex subsystem on a sophisticated aircraft and the cost to redesign and requalify a different component is cost prohibitive after the program matures out of the engineering stage. Although CPC supplied nonproprietary components, it was also cost prohibitive for other companies to compete for the secondary market of products when CPC "won" the initial development program. CPC, unlike the other competitors, already possessed the tooling, processes, forging dies, raw materials and subcontractors capable of manufacturing the specifics for that particular complex subsystem. Pneumo only lost a secondary sales market once, when McDonnell Douglas started producing landing gear for the F–18. McDonnell Douglas only started producing this landing gear due to CPC's poor performance record of shipping the landing gear. McDonnell Douglas did not want to produce this landing gear for the F–18's secondary sales market because it required an outlay of several million dollars to purchase the required custom toolings, forgings and machine tools. II Trial Tr. at 86.

We agree with the district court's conclusion that Pneumo did not introduce evidence sufficient to require an instruction on satisfaction. Since Pneumo did not prove that there was material evidence that it was not satisfied, the district court properly refused to give its proposed instruction A. *Lear v. Equitable Life Assurance Soc'y of the United States*, 798 F.2d 1128, 1133 (8th Cir.), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 953, 93 L.Ed.2d 1001 (1986).

We disagree with Pneumo's assertion that the district court's refusal to give proposed instruction A allowed the jury to construe the agreements. The court instructed the jury

that, in order to return a verdict in favor of Aerotronics, it must determine that Aerotronics had performed all of its obligations under both agreements and Pneumo did not perform its obligations under both agreements. VII Trial Tr. at 64–65. Paragraph 7B of both agreements clearly states that Aerotronics is entitled to commissions on extraterritorial sales only if Pneumo is satisfied that the extraterritorial sales resulted from Aerotronics' efforts with a prime contractor within its territory. The jury had both the NWL and the CPC agreements during its deliberations. Furthermore, during closing argument, Pneumo remained free to argue, and did argue, that it was not satisfied that Aerotronics was entitled to the extraterritorial commissions. Likewise, the jury was free to accept or reject this argument. By returning a verdict in favor of Aerotronics, the jury implicitly determined that Pneumo was, or should have been, satisfied.

## 2. Procuring Cause

Pneumo argues the district court erred in refusing its proposed instruction B [14] which required the jury to find that Aerotronics' efforts with McDonnell Douglas were the "procuring cause" of any extraterritorial orders before it was entitled to commissions on those orders. Pneumo argues that in both Ohio and Michigan, an agent is not entitled to a commission on a sale unless he was the procuring cause of that sale. We disagree.

In both Michigan and Ohio, the procuring cause doctrine is limited by the terms of a contract; it cannot be used to supplant or contradict the terms of a contract entered into between parties. *Davis & Tatera, Inc. v. Gray–Syracuse, Inc.*, 796 F.Supp. 1078, 1084 (S.D.Ohio 1992). The contract language governs a sales agent's entitlement to commissions. *Ditzik v. Schaffer Lumber Co.*, 139 Mich.App. 81, 360 N.W.2d 876, 881 (1984) (per curiam); *Davis & Tatera, Inc.*, 796

---

14. Defendant's Proposed Instruction B states:
 On Plaintiff's claims for commissions based on out-of-territory orders placed with NWL or CPC, your verdict must be for Defendant if you find Plaintiff's efforts with McDonnell Douglas Corporation were not the procuring cause of each particular order from customers out of the territory described in the contract. In

order for you to find that Plaintiff was a procuring cause of the sales, Plaintiff must do more than show it caused the first sale of airplane parts to McDonnell Douglas. Unless you find that Plaintiff participated in negotiating each out-of-territory order, then you must find for Defendant.
 Appellant's App. at A69.

F.Supp. at 1083. Accordingly, if the terms of the agreement entitle the sales agent to a commission regardless of whether it was a procuring cause, the procuring cause doctrine does not apply. *Ditzik,* 360 N.W.2d at 881. Thus, determining whether the procuring cause doctrine applies requires an examination of the contract language, in this case paragraph 7B.

■ The NWL and the CPC agreements simply state that Aerotronics is entitled to a commission with respect to extraterritorial sales if its efforts with a prime contractor within its territory in fact resulted in the purchase order. As the district court noted in its summary judgment ruling, neither agreement requires Aerotronics' efforts with the prime contractor to be new efforts. Addendum at Ad–8. Therefore, neither agreement requires Aerotronics to be the procuring cause of the secondary sales and the procuring cause doctrine is inapplicable.

Furthermore, the purpose of the procuring cause doctrine is "to prevent an agent from being denied a commission on a sale for which the agent performed the majority of the work and brought the sale essentially to fruition." *Davis & Tatera, Inc.,* 796 F.Supp. at 1084. Recognizing this purpose, the district court also refused proposed instruction B because the factual situation here is distinguishable from the usual procuring cause situation. The evidence produced at trial established that Aerotronics' efforts with McDonnell Douglas and Boeing won initial development programs of major subsystems on several military aircraft for Pneumo. Aerotronics expended considerable time and money in its efforts to obtain these programs, but received no compensation until the programs were awarded to Pneumo and Pneumo received payment on the sale of its products in connection with the program. As

a result of winning the initial development programs, Pneumo had no competition for the secondary sales market due to the complex nature of the subsystems involved. Accordingly, we agree with the district court that, in practice, the secondary sales market was not independent from the award of the initial development program. By virtue of "procuring" the initial development contract, Aerotronics "procured" the secondary sales market, and Pneumo's proposed instruction B is inapplicable in this factual situation.

Therefore, we affirm the district court's refusal to give Pneumo's proposed instruction B to the jury.

### 3. Equitable Estoppel

■ Pneumo appeals the district court's refusal to instruct the jury on its affirmative defense of estoppel, set forth in Pneumo's proposed instruction F.[15] The district court refused to give this instruction because Pneumo did not introduce sufficient evidence to support an instruction on estoppel. A party that fails to introduce evidence sufficient to support a jury instruction is not entitled to that instruction. *First Dakota Nat'l Bank v. St. Paul Fire & Marine Ins. Co.,* 2 F.3d 801, 815 (8th Cir.1993). In both Ohio and Michigan,[16] an estoppel defense consists of the following elements:

> a party, by representations, admissions, or silence, intentionally or negligently induces another party to believe facts, the other party justifiably relies and acts on this belief, and will be prejudiced if the first party is permitted to deny the existence of those facts.

*Hoye v. Westfield Ins. Co.,* 194 Mich.App. 696, 487 N.W.2d 838, 842 (1992); *Ragland v. Nationwide Mut. Ins. Co.,* 34 Ohio Misc.2d 1, 516 N.E.2d 254, 256 (1986). Before Pneumo

---

**15.** Defendant's Proposed Instruction F states:

> You may find for Defendant and against Plaintiff if you conclude that:
>
> First, Plaintiff either by representations, admissions or silence intentionally or negligently induced the Defendant to believe facts regarding any alleged breach of Defendant;
>
> Second, Defendant justifiedly [sic] relied and acted upon either the representations, admissions or silence of the Plaintiff; and

> Third, Defendant would be prejudiced were Plaintiff permitted to deny the existence of the representations, admissions or silence of the Plaintiff.

Appellant's App. at A70.

**16.** The parties agree, and we assume without deciding, that the NWL and the CPC agreements' choice of law provisions apply to any affirmative defenses asserted to prevent enforcement of the agreements.

is entitled to a jury instruction on this defense, there must be sufficient evidence introduced at trial on all of its elements.

We do not believe that there is sufficient evidence in the record that Aerotronics negligently or intentionally induced Pneumo to believe that it would not seek the commissions that are the subject of this lawsuit. Pneumo refers us to the testimony of Wood, Jr., that Aerotronics represented on at least three or four occasions that it was entitled to receive commissions on extraterritorial secondary sales. Appellant's App. at A191–92. However, Wood, Jr., testified that this issue was never resolved. *Id.* at A203. Pneumo also argues that Aerotronics' continued acceptance of reduced commission from .1% to .9% after 1987 constitutes a representation by Aerotronics that it accepted the continued reduction of commission. However, Pneumo acknowledges that Aerotronics objected to this reduction, asserting that it was entitled to the 1% rate after 1987. Schrecongost testified that he reviewed the reduction of commission rate, and determined that he did not want to take any action. VI Trial Tr. at 12. We do not believe that this evidence is sufficient to establish that Aerotronics represented that it did not believe that it was entitled to extraterritorial commissions or that they agreed to accept the reduced commission rate after 1987. Accordingly, the district court correctly refused Pneumo's proposed instruction F.

### C. Statute of Limitations

Pneumo and Aerotronics agree that Missouri law determines the applicable statute of limitations. Pneumo argues that the district court erred in determining that Missouri's ten-year statute of limitations applies, instead of its five-year statute of limitations. The district court's decision was based upon its interpretation of Missouri state law. As noted above, we review the district court's interpretation of state law de novo, giving its decision no deference. *Carvin,* 14 F.3d at 404 (citing *Salve Regina College v. Russell,* 499 U.S. 225, 231, 111 S.Ct. 1217, 1220–21, 113 L.Ed.2d 190 (1991)).

Missouri has two statutes of limitations that govern contract actions. A ten-year statute of limitations applies for "[a]n action upon any writing, whether sealed or unsealed, for the payment of money or property." Mo.Rev.Stat. § 516.110. A five-year statute of limitations applies for all other actions upon contracts, obligations or liabilities, whether express or implied. Mo.Rev. Stat. § 516.120(1). The district court determined that the ten-year statute of limitations applied, relying upon our decision in *Johnson v. State Mut. Life Assurance Co. of Am.,* 942 F.2d 1260 (8th Cir.1991) (en banc). Aerotronics argues that Pneumo waived the statute of limitations issue by failing to object to the introduction of evidence at trial of damages beyond the five-year statute of limitations. We first address Aerotronics' argument that Pneumo has waived its statute of limitations defense.

A motion in limine, by itself, is not sufficient to preserve an issue for appellate review. *Huff v. Heckendorn Mfg. Co.,* 991 F.2d 464, 466 (8th Cir.1993). This circuit recognizes an exception to this rule of waiver if the district court made a definitive pretrial ruling that affected the entire course of the trial. *Sprynczynatyk v. General Motors Corp.,* 771 F.2d 1112, 1118 (8th Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986). The test to determine whether objections at trial are necessary to preserve error "is whether an objection at trial would have been more in the nature of a formal exception or in the nature of a timely objection calling the court's attention to a matter it need consider." *Id.*

We believe that the court's ruling on which statute of limitations to apply falls within the exception recognized by *Sprynczynatyk.* Typically, a motion in limine is used to determine the admissibility of evidence at trial; this type of ruling is based upon a hypothesis as to how the evidence will be presented. *Huff,* 991 F.2d at 466. An objection is required to preserve error in order to give the district court the opportunity to reconsider the basis of the motion in light of the actual, as opposed to hypothetical, facts. *Id.* In contrast to the typical motion in limine, the district court's ruling on the applicable statute of limitations was made as a matter of law, it was not based upon a hy-

pothesis as to how evidence would be presented at trial. The actual presentation of facts at trial has no impact on the court's ruling. Therefore, an objection by Pneumo at trial is similar to a formal exception, which is not required. Accordingly, we do not believe that Pneumo waived its statute of limitations defense by failing to object to the introduction of damage evidence beyond the five-year statute of limitations. We now discuss whether the five- or ten-year statute of limitations applies to this action.

The district court determined that the ten-year statute of limitations applied, relying on our decision in *Johnson.* In *Johnson,* we noted that the law in Missouri is inconsistent, at best, in determining which statute of limitations to apply. We surveyed Missouri's law and deduced the following test for determining which of the two Missouri statutes of limitations applied:

> if the plaintiff's contract claim is not based upon a written promise to pay money, so that any right to the payment of money must be proved by extrinsic evidence of a breach of contract, then the five-year statute applies. However, if the plaintiff's contract claim is based upon a written promise to pay money, then the ten-year statute applies 'although the plaintiff may, to make out his case, be required to go beyond the terms of the writing to show performance on the part of the plaintiff and a breach on the part of the defendant.'

*Johnson,* 942 F.2d at 1265 (citations omitted). We rejected, as inconsistent with Missouri law, more restrictive tests that the Missouri Court of Appeals has applied that (1) require the writing to contain an admission of present indebtedness, as opposed to a promise to pay money if a specified condition occurs in the future, or (2) reject application of the ten-year statute of limitations if the obligation to pay is contingent upon proof of extrinsic facts. *Id.* at 1264.

■ Under the test announced in *Johnson,* the district court correctly determined that the ten-year statute of limitations applies to Aerotronics' claims. The NWL and the CPC agreements expressly provide that Pneumo "shall pay commissions to [Aerotronics] computed on the Price of all Prod-

ucts sold under orders originating in the Territory during each year of the term of this agreement as follows...." Appellant's App. at A85, A102. Furthermore, paragraph 7B provides that Aerotronics will receive half of its normal commission rate for certain extraterritorial sales, and paragraph 11 sets forth the terms under which Pneumo will pay Aerotronics' commissions after the agreements are terminated. Aerotronics' suit is based upon these written promises to pay money: It alleges that Pneumo breached its sales agreements by failing to pay Aerotronics various commissions earned. Because no extrinsic evidence is necessary to prove the obligation to pay money, the ten-year statute of limitations is applicable. Accordingly, pursuant to *Johnson,* it is irrelevant that plaintiff may have to rely on extrinsic evidence to show that the promises to pay, contained in the CPC and the NWL agreements, have matured.

Pneumo argues that we are not bound by the holding in *Johnson* because it involves benefits due under a life insurance policy and is therefore factually distinguishable. We disagree. Pneumo argues that the five-year statute of limitations applies here because Missouri applies the five-year statute of limitations for breach of contract actions. However, the determinative factor in Missouri remains whether the writing "either expressly or by fair implication contains a promise to pay money." *Martin v. Potashnick,* 358 Mo. 833, 217 S.W.2d 379, 380 (1949). Accordingly, the Missouri courts have applied the ten-year statute of limitations to enforce a contract term to pay commission in *South Side Realty Co. v. Hamblin,* 387 S.W.2d 224 (Mo. App.1964); an action against an insurance company for refusal to pay uninsured motorist benefits in *Edwards v. State Farm Ins. Co.,* 574 S.W.2d 505 (Mo.App.1978); and actions to enforce the provisions of a guaranty signed by defendant in *Cook v. State,* 752 S.W.2d 483 (Mo.App.1988), and *Mark Twain Bank, N.A. v. Platzelman,* 740 S.W.2d 388 (Mo.App.1987).

■ The Missouri courts distinguish between an action to enforce a provision of the contract and an action for breach of contract: applying the ten-year statute of limitations to

the former, and the five-year statute of limitations to the latter. *Sam Kraus Co. v. State Highway Comm'n,* 416 S.W.2d 639, 641 (Mo. 1967). *Sam Kraus Co.* involved a suit by a construction company to recover money it paid to settle a damage claim arising out of work performed by the company pursuant to a state contract. *Id.* The Missouri Supreme Court held that the five-year statute of limitations applied because the plaintiff sued for a breach of warranty. *Id.* at 640. In determining that the ten-year statute of limitations did not apply, the court noted that although the State Highway Commission agreed to pay Sam Kraus Company "a specified sum for labor and material furnished in constructing the portion of highway" involved in this suit, the complaint did not seek recovery for this compensation due Sam Kraus, but rested on a breach of another provision in the contract. *Id.* at 641. Similarly, the Missouri Supreme Court held that the five-year statute of limitations applies to a breach of written agreement to arbitration in *Martin,* 217 S.W.2d at 382. In *Martin,* the court examined the plaintiff's cause of action and found it was apparent that the written promise set forth in the agreement was not the obligation that he was seeking to enforce. *Id.* at 381. Likewise, the court applied the five-year statute of limitation in *McIntyre v. Kansas City,* reasoning that McIntyre's complaint was for a breach of contract that resulted in damages, rather than enforcement of a contract term for the payment of money. 171 S.W.2d 805, 811 (Mo.App.1943).

Nor does *Superintendent of Ins. of New York v. Livestock Mkt. Ins. Agency, Inc.,* 709 S.W.2d 897 (Mo.App.1986), require us to apply the five-year statute of limitations to Aerotronics' complaint. In *Superintendent of Insurance,* the court determined that the five-year statute of limitations governed an indemnity claim because the plaintiff's right to indemnity was "not apparent from the petition" because "resort to extrinsic facts was essential to establish both the existence of the obligation to pay under the indemnity agreement, as well as the amount of the loss." *Id.* at 902–03. However, Pneumo's obligation to pay commissions is apparent under the plain terms of the agreements, and

no resort to extrinsic evidence is required to prove this obligation.

We disagree with Pneumo's assertion that *Johnson* is factually distinguishable. In *Johnson,* we undertook a comprehensive review of Missouri's confusing application of its two statutes of limitations for contract actions. We discerned a test that we believe the Missouri courts utilize to determine which of the two statutes applies. This test was not limited to contracts for the payment of insurance, as Pneumo argues. As discussed above, *Sam Kraus Co., Martin* and *McIntyre* do not require a finding that the five-year statute of limitations applies because those cases involve a breach of contract, whereas Aerotronics' suit is for the enforcement of contract terms that require Pneumo to pay it commissions. Accordingly, the district court properly determined that the ten-year statute of limitations applies.

Nor do we believe that the Missouri Court of Appeals' decision in *Van Stratten v. Friesen,* 841 S.W.2d 750 (Mo.App.1992), requires a contrary decision. In *Van Stratten,* the Missouri Court of Appeals determined that the five-year statute of limitations applied to contract provision which contained a promise to pay money dependant upon several contingencies. *Id.* at 752. However, the basis of the suit was the failure to perform a funeral for the agreed upon price. *Id.* at 751. Accordingly, this suit is also for a breach of contract, and not a suit to enforce a contract term for the payment of money. In any event, in diversity cases, we are to apply the law that we believe the Missouri Supreme Court would apply. *Carvin,* 14 F.3d at 403–04. Decisions by the Missouri Court of Appeals may be used as an indication of how the Missouri Supreme Court may rule, but we are not bound to follow these decisions. We believe that the Missouri Supreme Court would apply the ten-year statute of limitations to Aerotronics' claims against Pneumo. Thus, we affirm the decision of the district court.

**D. Judgment as a Matter of Law**

 Pneumo argues that the district court erred in failing to grant it judgment as a matter of law on Aerotronics' claims for:

(1) commissions on extraterritorial and post-termination sales; (2) 1% commissions due from CPC; and (3) posttermination CPC commissions calculated at pretermination rates. We review the district court's denial of a motion for judgment as a matter of law de novo, applying the same standards as the district court. *McKnight v. Johnson Controls, Inc.*, 36 F.3d 1396, 1400 (8th Cir.1994). The legal question presented to this Court on review is whether there is sufficient evidence to support the jury's verdict. *Id.* In answering this question, we view the evidence in the light most favorable to the prevailing party, and we do not weigh or evaluate the evidence or consider questions of credibility. *Id.*

Pneumo argues that the district court should have determined that Aerotronics was not entitled to extraterritorial commissions because it was not the procuring cause of those commissions. We reject this argument because we have already decided that neither the CPC agreement nor the NWL agreement required Aerotronics to be the procuring cause of these extraterritorial sales. With respect to posttermination sales, Pneumo argues that the district court should have found that both agreements unambiguously prevent the payment of posttermination commissions. We also reject this argument because we previously determined that the term "order" used in paragraph 11 was ambiguous.

Pneumo next argues that it was entitled to judgment as a matter of law with respect to Aerotronics' claim to commissions from CPC at the 1% rate after 1987. In late 1985, or early 1986, Aerotronics and CPC entered into a letter amendment to the CPC agreement that unambiguously reduced Aerotronics' commission for sales grossing over $2,000,000 from 1% to .9%. The agreement provided that the parties would review the commission rate after two years and "terminate, continue, or revise such fee arrangement ... as the parties may then agree." Appellant's App. at A97. Prior to this language, the letter amendment states that "it was agreed that modification of the fee arrangement identified in Exhibit B and to Aerotronics' representative responsibilities under Exhibit A of the Cleveland Pneumat-

ic/Aerotronics' Sales Agreement dated March 16, 1970, as amended ("Sales Agreement") would be effected for the years 1986 and 1987." *Id.* It is apparent to us that the letter amendment plainly states that it is effective only for the years 1986 and 1987, or, at the very least, is ambiguous as to whether it automatically terminates.

Alternatively, Pneumo argues it was entitled to judgment as a matter of law because Aerotronics waived its right to the increase by accepting the .9% commissions beyond 1987. However, viewing the evidence in the light most favorable to Aerotronics, we believe there was more than sufficient evidence that it did not waive its right to commissions at the 1% rate. As noted above, Aerotronics at all times asserted to Pneumo that it was entitled to commissions at the 1% rate. Furthermore, the letter agreement reducing Aerotronics' commissions is, at the very least, ambiguous as to whether it automatically expired in December 1987 or remained effective until terminated. As such, the jury could have found that the commission reduction automatically terminated in December 1987.

We also reject Pneumo's argument that the district court should not have submitted Aerotronics' claims for posttermination commissions from CPC at the commission rate set forth in the CPC agreement. Pneumo argues that the CPC agreement "unambiguously provide[s] that the commission rate schedule applied only during the term of the contract." However, based upon our independent review of the CPC agreement, as set forth in Appellant's Appendix at A82–A98, we did not find a contract provision that unambiguously states that the commission rate schedule applied only during the term of the contract.

Therefore, we affirm the district court's denial of Pneumo's motion for judgment as a matter of law.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.